**BROOKLYN UNION GAS CO. v. NIXON et al.**

(District Court, S. D. New York. May 3, 1921.)

1. **Gas** ⬦⟋14(1)—**Constitutionality of statutory rates determined by present conditions.**

In determining whether or not statutory rates fixed for a gas company are confiscatory, court is concerned only with conditions of present and immediate past, and cannot speculate as to conditions in futuro, and result of operations of company during period of three years immediately preceding hearing is sufficient as basis for decision.

2. **Gas** ⬦⟋14(1)—**Remunerative past dividends cannot affect right to present fair earnings.**

That gas company paid remunerative dividends in past cannot affect its right to earn fair return on its invested capital in present or future.

3. **Gas** ⬦⟋14(1)—**Statutory rate imposed on gas company held confiscatory.**

Findings of a special master that the maximum rate fixed by statute was confiscatory as to complainant company held fully supported by evidence showing a continuous decrease in net earnings for three years and an actual loss in the last year.

In Equity. Suit by the Brooklyn Union Gas Company against Lewis Nixon, constituting the Public Service Commission of the State of New York, First District, Charles D. Newton, as Attorney General of the State of New York, and Harry E. Lewis,

District Attorney of Kings County. On report of special master. Confirmed.

See, also, 269 Fed. 452.

Cullen & Dykman, of Brooklyn, N. Y., for complainant.

John P. O'Brien, of New York City, for defendant Lewis.

Godfrey Goldmark and Terence Farley, both of New York City, for defendant Public Service Commission.

Wilbur W. Chambers, of Albany, N. Y., for defendant Newton.

MAYER, District Judge. 1. Fifteen years ago, the so-called 80-cent gas law was enacted. Laws of 1906, chapter 125. From that time until the very recent enactment of Laws of 1921, chapter 134, there was no public body nor agency which had jurisdiction to regulate the price of gas, beyond the statutory rate, so far as concerned this and certain other gas companies in the city of New York. The World War so completely changed and disturbed economic conditions that standards useful in normal times ceased to be of value. Men of ordinary sense soon learned that prophecy was a lost art, and experience abundantly proved that what was reasonably to be expected in normal times failed to furnish any basis for guidance during the time when not alone the United States, but the entire world, was passing through an extraordinary period, first of war disturbance and then of economic readjustment and rearrangement.

[1] Industrial differences, leading to strikes, here and elsewhere, unusual transportation conditions and difficulties, lessened production in other countries of essential factors, such as oil, or inability freely to move such factors in the channels of world commerce, and greater uses in other business activities of some of the essentials needed for gas manufacture, all combined to upset those calculations and forecasts which capable business men were accustomed to make in normal times. When, therefore, it is plain that an enterprise held within the limits of a statute to a definite maximum charge has faced and is facing cold facts which spell confiscation, a period much less than would otherwise be necessary may be taken as a test period, and so the courts have held in a number of cases now well familiar to litigants and counsel in this case.

To prolong the period would work a practical injustice. The special master in this case has based his conclusions on the years 1918, 1919, and 10 months of 1920. Pursuant to the direction of the court, he held his first session on September 8, 1920, and thereafter he held hearings almost continuously to February 24, 1921. Prior to that time, for purposes of expedition, plaintiff had furnished defendants with elaborate data, the failure to furnish which would undoubtedly have considerably prolonged the case before the special master.

To go back of 1918 would not have served any useful purpose, but each year would have added months of hearings, without adding enlightenment as to results. In cases of this kind, expedition, so far as is consistent with a full inquiry, is necessary. If the rate imposed on a public utility fails to yield a fair return, the public suffers in the end by depreciated plant and equipment and the inability to furnish proper service. New money is made more difficult to obtain, and investors become timid.

It is contended, however, that the future indicates a trend toward falling prices. This may prove true, but the extent of the decrease and the time when the decrease will become sufficient to affect materially the actual results is all in the realm of speculation, and the court is concerned only with the facts before it, and not with the uncertainty of guessing what the future will bring. It is therefore held that the test period was sufficient.

2. The master has made a full and thoughtful report. He has resolved every doubt against the plaintiff. He was appointed because, with his experience as a former Deputy Attorney General of this state and as a referee in important special franchise cases, he is familiar with controversies of this character. He saw and heard the witnesses, and his conclusions in weighing the testimony are sound, and are well confirmed by the record. Much of the detail need not be here repeated, for it is well set forth in the report.

[2] 3. The Contingency Fund. There is much argued upon this point. If there were an actual cash contingency fund on hand, it might well be contended that it should now be utilized to carry plaintiff over a confiscatory period. This so-called fund, however, does not exist as cash. It has gone into the property in one form or another. That dividends have been paid in the past does not produce a cash fund in the present. As was said by the statutory court:

"The question for our present consideration is not whether the plaintiff enjoyed remunerative returns in prior years, which were perfectly legal, but whether at the present time it is receiving and is likely to receive in the future a fair return upon its invested capital. We think no one would contend for the converse proposition, viz. that if in prior years the plaintiff had received very inadequate returns it ought to have for that reason in the present and future more than a fair return upon its capital invested."

4. The allowances for unaccounted-for gas cannot be accurately ascertained. I agree with the master in the per cent. he arrives at for the subsidiaries in the outlying sections. It may be that the unaccounted-for gas will decrease if, among other things, the condition caused by extracting toluol for munition purposes of the federal government can be remedied. The master's figures under this head are accepted.

5. Uncollectible Bills. There is apparently no way of accurately ascertaining uncollectible bills for a particular year, but in a matter of this kind an average can be allowed. I should say one-quarter to one-half of 1 per cent. of the gross sales was reasonable, but, if the item were stricken out, it would make no difference in this case.

6. As the services rendered by Mr. Carter were apparently in connection with the rate case, the $7,500 will be disallowed. As Mr. Beattie's service was not in connection with ordinary operation, the amount of $17,260.-81 will be disallowed. These disallowances do not affect the result.

7. Working Capital. The allowance of $4,000,000 in a business of this magnitude is sustained. Prudent business men must look ahead, and be prepared by having an amount of working capital reasonably necessary for their requirements.

8. The charges of collusion and the like in respect of the oil contract and dealings are not supported by a scintilla of proof.

9. The theory on which the master dealt with relations between the plaintiff and its subsidiaries is sound, and he has correctly found the facts. His opinion in respect thereof is adopted.

10. Rate Base. It is inconceivable on any theory how a rate base of less than (in round numbers) $28,000,000 for 1918, excluding working capital, and $27,000,000 for 1919, could be found. In the 10 months of 1920, there was a net loss of $2.89 per 1,000 cubic feet sold; hence the rate base for that period is immaterial.

[3] The master has so fully discussed the question of a rate base that amplification is unnecessary. He has been conservative, and on the basis of the 1919 figures I should have been inclined to increase the rate base; but, as there is no exception by plaintiff, I will leave it where the master placed it. With a net return of only 3½ per cent. on a base for 1918 which excluded working capital, of less than 1 per cent. in 1919, and an actual loss in the 10 months of 1920, the rate of return is an academic question.

11. On all the evidence, plaintiff has shown that the statutory rate of 80 cents is confiscatory. As has been frequently stated, this court will not fix a rate. Its duty ends when it determines whether or not the statute is constitutional, so far as concerns the plaintiff. The power to fix a just and proper rate now rests with the commission created by chapter 134 of Laws of 1921 of the state of New York.

In all respects, not specifically referred to in this memorandum, the report will be confirmed.